**In re Terry L. DETKO, Debtor.**

**No. 02–10906.**

United States Bankruptcy Court.
D. Vermont.

Feb. 11, 2003.

Gleb Glinka, Glinka & Schwidde, Cabot, VT, for the Debtor.

Scot L. Kline, Eggleston & Cramer, Ltd., Burlington, VT, for Chittenden Bank.

## MEMORANDUM OF DECISION

ON THE DEBTOR'S MOTION TO AVOID LIEN AND ON CHITTENDEN BANK'S OBJECTION TO DEBTOR'S CLAIM OF EXEMPT PROPERTY

COLLEEN A. BROWN, Bankruptcy Judge.

On July 6, 2002, the Debtor filed a Motion to Avoid Lien Impairing Debtor's Homestead Exemption (doc. # 5). On July 15, 2002, Creditor Chittenden Bank (hereinafter, "the Bank") filed both an Objection to Motion to Avoid Lien (doc. # 10) and an Objection to Debtor's Claim of Exempt Property (doc. # 9). Subsequently, on August 8, 2002, the Court held an evidentiary hearing on the Debtor's Motion to Avoid Lien and the Bank's Objections. The Court reserved decision and directed the parties to file supplemental papers.

This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 157 and 1334 and finds this to be a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Based upon the evidence presented at the August 8, 2002 evidentiary hearing and the parties' papers, and for the reasons stated below: (1) the Debtor's Motion to Avoid Lien Impairing Debtor's Homestead Exemption is granted; and (2) the Bank's Objection to Debtor's Claim of Exempt Property is overruled.

### I. BACKGROUND

**A. Findings Based Upon the Joint Proposed Undisputed Findings**

### of Fact [1]

In December 1989, the Debtor and her former husband, Kevin Renfrew, purchased a residence at 43 Oglewood Road in Milton, Vermont (hereinafter, "the Milton Residence"). It is the only Vermont residence the Debtor has ever owned. Subsequently, in 2001, the Debtor and Mr. Renfrew were divorced. Thereafter, Mr. Renfrew transferred his interest in the Milton Residence to the Debtor. Pursuant to the divorce decree, the Debtor was given sole possession and ownership of the Milton Residence.

In November 2001, the Debtor listed the Milton Residence for sale with a realtor. On December 5, 2001, the Debtor and her son left the Milton Residence, taking their personal belongings, and went to Florida. However, Mr. Renfrew still kept some of his belongings at the Milton Residence even though he no longer had an ownership interest in the property, and he knew he was not authorized to do so. Quickly thereafter, on December 7, 2001, the Debtor received what would be the first offer on the Milton Residence; the Debtor accepted this offer on December 8, 2001. Ultimately, though, the contract was never consummated.

Upon moving to Florida, the Debtor lived with her sister in a mobile home in West Palm Beach. The Debtor enrolled her son in school in Florida. He finished the school year there, with the semester ending in June 2002. While in Florida, the Debtor registered to vote there. She also titled and registered one of her automobiles in Florida. Additionally, the Debtor surrendered her Vermont driver's license to the Florida Department of Motor Vehicles and obtained a Florida driver's license.

During her stay in Florida, the Debtor maintained her Vermont savings and checking accounts with the Vermont Federal Credit Union. However, she also opened a bank account with a Florida financial institution. Throughout her stay in Florida, from December 2001 to June 2002, the Debtor worked in West Palm Beach. Her hours varied from zero to forty hours per week, and, other than child support, this work was her only source of income. During this period, the Debtor did not work as a cosmetologist, her vocation while she lived in Vermont, because she was not licensed as a cosmetologist in Florida. It is also noteworthy that when the Debtor filed her 2001 state and federal tax returns in February 2002, she listed her address to be the Milton Residence; her returns were signed February 15, 2002, while the Debtor still owned the house in Milton, but while she was living and working in Florida.

While the Debtor was living in Florida, she did not rent the Milton Residence. Rather, it stayed on the market, listed for sale. On February 20, 2002, the Debtor received a second offer on the house, but she did not accept this offer. A third offer was made on the house on March 13, 2002, which the Debtor accepted. The sale on that contract closed on April 26, 2002. Up to the time of the sale, the Debtor's payments on the mortgage were current.

Prior to the Debtor's return to Vermont, the Bank instituted a suit in state court against Mr. Renfrew and the Debtor on a debt they owed to the Bank unrelated to the mortgage. On May 10, 2002, the Bank secured *ex parte* pre-judgment trustee process for $55,000 against the proceeds of the sale of the Milton Residence.

Soon thereafter, after the Debtor's son finished the school year, the Debtor re-

---

**1.** Pursuant to the Court's instruction, the par- ties submitted a Joint Proposed Undisputed

turned to Vermont. The Debtor filed a chapter 7 bankruptcy petition on July 1, 2002. In her bankruptcy schedules, the Debtor claimed the proceeds from the sale of the Milton Residence as exempt pursuant to 27 V.S.A. § 101 and 12 V.S.A. § 3023. On July 6, 2002, the Debtor filed a Motion to Avoid Judicial Lien Impairing Debtor's Homestead Exemption, seeking to avoid the Bank's lien, pursuant to 11 U.S.C. § 522(f)(1)(A). Thereafter, the Bank filed an Objection to the Motion and an Objection to Debtor's Claim of Exempt Property.

### B. Findings Based Upon the Evidentiary Hearing

At the August 8, 2002 evidentiary hearing on the Debtor's Motion to Avoid, the Court heard the testimony of the Debtor; of Mr. Kevin Renfrew, the Debtor's ex-spouse; and of Mr. Walter Detko, the Debtor's father. The witnesses' testimony helped bring the facts to life, providing a context for the cold assertions presented in the parties' Joint Proposed Undisputed Findings of Fact.

The Debtor's testimony clarified many facts. For example, the Debtor testified that her ex-husband's drinking made it "difficult to live in the home." *See* Transcript of Hearing on Motion at p. 8, *ll.*16–21 (Aug. 8, 2002) (doc.# 17) (Transcript hereinafter cited as "Tr. at p.[# ], *l.*[# ]"). Significantly, the Debtor testified that her ex-husband's renewed drinking was making her life very stressful and that she "felt the only way [she] was going to get him to leave the house is [sic] to put the home up for sale." Tr. at p. 12, *ll.*17–22. When questioned by the Bank's counsel whether she had contemplated taking any legal action to remove her ex-husband from the home, the Debtor testified that she did not take any such action because she did not want their son to perceive her

as "the bad person in the situation." Tr. at p. 67, *ll.*4–16. She further explained that her extended stay in Florida was "to recuperate from a lot of things going on." Tr. at p. 13, *ll.*8–12.

Importantly, the testimony of both Mr. Renfrew and Mr. Detko reiterated and lent support to the Debtor's testimony regarding the unsafe home environment the Debtor and her son experienced prior to leaving the Milton Residence in December 2001. First, Mr. Renfrew testified that prior to the Debtor leaving for Florida, he was drinking and taking anti-depression medication at the same time, and that this combination had often caused him to be violent in the home. *See* Tr. at p. 69, *l.*15— p. 70, *l.*1. He acknowledged that as a result of his conduct, it was indeed safer for the Debtor to have left the house. *See id.* Further, Mr. Renfrew testified that he thought the Debtor was fearful of him during the months prior to her departure. *See* Tr. at p. 79, *ll.*10–13. It was Mr. Renfrew's understanding that his ex-wife's trip to Florida was intended to give her a respite away from him. *See* Tr. at p. 79, *ll.*14–20. Additionally, Mr. Detko testified that he understood his daughter was going to Florida to get away from the stress of her divorce, *see* Tr. at p. 85, *ll.*18–23, and that his daughter had complained to him that Mr. Renfrew was being both physically and verbally abusive to her before she left. *See* Tr. at p. 85, *ll.*8–14.

There was also testimony about the Debtor's intention to return to the Milton Residence. The Debtor testified that it was always her intention to return to Vermont and, if she could not sell her home, she intended to move back into the Milton Residence. *See* Tr. at p. 13, *ll.*13–24; *see also* Tr. at p. 32, *ll.*6–13; Tr. at p. 64, *l.*15– p. 65, *l.*18. This is consistent with Mr.

Findings of Fact. (*See* doc. # 19.)

Renfrew's testimony that he thought his ex-wife's trip to Florida was a designed as a way for her to get away from him temporarily. *See* Tr. at p. 79, *ll.*14–20. Likewise, Mr. Detko testified that it was his understanding, from his conversations with the Debtor, that she intended to return to the Milton Residence if she could not sell the home. *See* Tr. at p. 91, *ll.*11–25 and p. 92, *l.*4.

Additionally, through her testimony, the Debtor elucidated the rationale for many of her actions while in Florida. For example, the Debtor explained that, in addition to maintaining her Vermont bank accounts, she opened a checking account in Florida so she could cash checks. *See* Tr. at p. 17, *l.*16 and p. 20, *ll.*17–23. Likewise, the Debtor testified that she turned in her Vermont driver's license because she was required to do so in order to get a Florida driver's license, and she needed a Florida drivers' license to use for identification when cashing and writing checks. *See* Tr. at p. 24, *ll.*11–23. However, since she was planning on returning to Vermont, the Debtor re-registered her Saab with the Vermont Department of Motor Vehicles when it came up for renewal while she was still in Florida. *See* Tr. at p. 21, *ll.*16–25.

The Debtor also testified that she registered to vote in Florida because she was "put on the spot" to sign a petition about overcrowding in the classrooms, *see* Tr. at p. 42, *ll.*1–16, and in order to sign the petition, she had to be a registered voter. *See* Tr. at p. 25, *ll.*17–25. Thus, to oblige the petitioner, the Debtor simultaneously filled out and signed a Florida Voter's Registration card, giving her sister's Florida address as her legal residence, and signed the petition. *See* Tr. at p. 50, *l.*24– p. 51, *l.*4. I find the Debtor's testimony to be credible and am persuaded that the Debtor did not understand the legal ramifications of signing the Voter Registration card, vis a vis her homestead interest in the Milton Residence. *See* Tr. at p. 64, *ll.*11–24.

The Debtor also explained that she brought a second automobile to Florida, which, after she had re-titled and registered in Florida, she allowed her sister to use. The Debtor testified that her sister continues to use that car although the Debtor retains ownership of it. *See* Tr. at p. 23, *ll.*9–23. Finally, the Debtor testified that when she filed her 2001 state and federal tax returns on February 15, 2002, she listed her Milton Residence address on the returns because she still considered Vermont her home. *See* Tr. at p. 26, *ll.*15– 23.

## II. DISCUSSION

The issue before the Court is whether the Debtor abandoned her homestead, *i.e.*, the Milton Residence, when she left Vermont in December 2001. Once this issue is determined, the Court can rule on both the Debtor's Motion to Avoid Lien Impairing Debtor's Homestead Exemption and the Bank's Objection to Debtor's Claim of Exempt Property as the legitimacy of her homestead exemption is the determinative issue as to each.

### A. Burden of Proof

The gravaman of the Bank's two Objections is whether the Debtor is entitled, under the circumstances, to claim a homestead exemption, not whether the Debtor may invoke 11 U.S.C. § 522(f). Since the "objecting party has the burden of proving that the exemptions are not properly claimed," Fed. R. Bankr.P. Rule 4003(c), in this case, the Bank has the burden of proof as to its Objection to Debtor's Claim of Exempt Property, as well as its Objection to Debtor's Motion to Avoid Lien Impairing Debtor's Homestead Exemption. *See, e.g., In re Herd,* 176 B.R. 312, 314 (Bankr.D.Conn.1994) (finding

creditor's objection to debtor's § 522(f) motion was identical to its objection to debtor's claim of homestead exemption; therefore, creditor carried burden of proof on both matters).

### B. Case Law Analysis

 "[I]n Vermont, as in most (if not all) jurisdictions, exemption statutes are considered to be remedial in nature and thus ought to receive a liberal construction in favor of debtors." *Delaney v. Obuchowski (In re Delaney),* 268 B.R. 57 (D.Vt. 2001) (citing *Parrotte v. Sensenich (In re Parrotte),* 22 F.3d 472, 474 (2d Cir.1994); *In re Rule,* 38 B.R. 37, 41 (Bankr.D.Vt. 1983); *In re McQueen,* 21 B.R. 736, 738 (Bankr.D.Vt.1982)); *Jewett v. Guyer,* 38 Vt. 209 (1865) ("The homestead exemption has been repeatedly recognized in this court [the Vermont Supreme Court] as being humane in its character, and the statute should receive a liberal construction in view of the objects aimed at by it."). The purpose of Vermont's homestead exemption is "to preserve a home for the family; to protect the family as a unit whether it consists of a husband and wife or any other natural person." *In re Evans,* 51 B.R. 47, 50 (Bankr.D.Vt.1985) (citing *In re D'Avignon,* 34 B.R. 790, 793 (Bankr.D.Vt.1981), *aff'd,* 34 B.R. 796, 800 (D.Vt.1982)).

 "Once a property has become a homestead, it can lose its character only through death, alienation, or abandonment. Typically, the homestead is abandoned when the debtor either sells the property or establishes a new homestead." *In re Brent,* 68 B.R. 893, 896 (Bankr.D.Vt.1987) (internal citation omitted). However, abandonment can be shown when the "homestead is no longer used as a homestead;" at that point, the "homestead has ceased to exist." *Id.* (citing *In re White,* 18 B.R. 95, 97 (Bankr.D.Vt.1982); *Cushman v. Davis,* 79 Vt. 111, 118–20, 64 A. 456 (1906)). It is irrelevant whether another homestead has been acquired. *Id.*

 Conversely, "if a debtor intends to return to the homestead, then the homestead has not been abandoned;" and during the debtor's absence, the homestead remains exempt. *Id.* (citing *West River v. Gale,* 42 Vt. 27, 33–34 (1869)). Thus, the relevant consideration in determining abandonment of the homestead is "whether the debtor has an intention to return." *Id.* (citing *In re White,* 18 B.R. at 97; *In re Wolff's Estate,* 108 Vt. 54, 57, 182 A. 187 (1936); *Thorp v. Wilbur,* 71 Vt. 266, 270, 44 A. 339 (1899); *Whiteman v. Field,* 53 Vt. 554, 556 (1881)). This Court (Conrad, J.) has instructed: "A debtor's intent to maintain or abandon the homestead must be determined in relation to the surrounding exigencies." *Id.* (citing *In re Neis,* 723 F.2d 584, 590 (7th Cir.1983)).

In *In re Brent,* the debtor and his ex-spouse owned a home in Montpelier. Although not living in the home at the time he filed his bankruptcy petition, the debtor: (1) listed the Montpelier address as his home; and (2) claimed a portion of the Montpelier home as exempt under 11 U.S.C. § 522(d). His ex-spouse objected to the claim of the homestead exemption. At the hearing on the ex-spouse's objection, the debtor testified that he did not live at the Montpelier home on the date of his bankruptcy filing because: (1) he generally lived away from the Montpelier home to be close to his work; and (2) a state court order "overrode [his] intention to return." *In re Brent,* 68 B.R. at 894. Further, the debtor testified he considered the Montpelier home to be his homestead and, but for the perceived restraint contained in the state court order, he would return to that home. *See id.*

Significantly, the Court found the Debtor's residing in another town—close to his

work and where he received his mail—was "a temporary accommodation to the exigencies of debtor's employment and did not create a new homestead." *Id.* (citing *In re Wolff's Estate,* 108 Vt. 54, 56, 182 A. 187 (1936) (occupancy for a temporary purpose insufficient to establish homestead)). Moreover, the Court found the debtor's mistaken understanding of the state court order (*i.e.,* that the order prohibited debtor's return to the Montpelier property) was akin to an involuntary surrender of his homestead. Since the debtor intended to return to the Montpelier home and "because a homestead can only be relinquished voluntarily," the Court found the debtor had not abandoned the homestead. Therefore, the Bankruptcy Court overruled the ex-spouse's objection.

The debtor's intention played a key role in the Court's determination whether the debtor was entitled to claim a homestead exemption in two other Vermont bankruptcy cases. In a case pre-dating *Brent,* in *In re White,* 18 B.R. 95 (Bankr.D.Vt.1982) (Marro, J.), the debtors had moved out of their Swanton, Vermont home to run a business in Richford, Vermont. They intended to change their residence if the business proved successful. *In re White,* 18 B.R. at 96. While in Richford, the debtors rented their Swanton home, but: (1) maintained their mailing address in Swanton; (2) voted in Swanton; and (3) registered their car using their Swanton address. When the business did not succeed, the debtors moved back to Swanton. Weighing all these facts, the Court found the debtors "never had any intention of abandoning their homestead permanently." *Id.* at 96–97. Thus, since the facts of the case did not establish that the debtors had abandoned their homestead, the court held that the debtors were entitled to a homestead exemption. *See id.*

Conversely, in *In re Masi,* 1987 WL 19489 (Bankr.D.Vt.1987) (Conrad, J.), the Court found the debtor had voluntarily abandoned his homestead. In that case, prior to filing for bankruptcy, the debtor had entered into a purchase and sale agreement on his Barre, Vermont property. In reliance on that agreement, the debtor moved to an apartment in Barre. However, he remained in the apartment even after the sale of the Barre property fell through. Noting that it had earlier instructed that a " 'clear intention to sell in the future, *without more,* cannot establish a present abandonment of [a] homestead,' " *id.* (quoting *In re Bernstein,* 62 B.R. 545 (Bankr.D.Vt.1986) (emphasis added)), the Court found that in this instance there was something more. Specifically, the Court found the fact that the debtor failed to return to the property after the sale fell through to evidence the debtor's intent to abandon the property.

### C. The Instant Case

■ While fortunate to have case law at both ends of the "abandonment spectrum," I find that this case does not fall clearly at either extreme. The facts of the case, and in particular, the exigencies of the Debtor's circumstances relative to her homestead, if any, will determine where the case fits on that continuum.

On their face, the following facts could potentially be viewed as evidencing the Debtor's intent to abandon the Milton Residence as her homestead: (1) the Debtor's extended stay in Florida; (2) the Debtor's opening of a checking account in Florida; (3) the Debtor's acquisition of a Florida driver's license; (4) the Debtor's registering to vote in Florida; and (5) the Debtor's registering her second car in Florida. However, after considering the testimony of the Debtor, Mr. Renfrew and Mr. Detko, and finding the testimony of each to be credible, I am persuaded that these facts

are not sufficient to support a finding that the Debtor abandoned the Vermont homestead.

First, and most significantly, I find the Debtor's decision to leave the Milton Residence to go to Florida to be less than voluntary. Rather, because of her unstable domestic situation, her ex-husband's admittedly irresponsible use of alcohol and medications, and the potential for violent encounters in the family home, the Debtor felt compelled to leave the Milton Residence for her safety. Moreover, the Debtor's decision to leave the Milton Residence was influenced by concerns for her son. The testimony of the Debtor's ex-spouse corroborated these circumstances and corroborated the Debtor's safety concerns for both herself and her son. Likewise, Mr. Detko's testimony confirmed that the Debtor was being subjected to physical and verbal abuse for as long as she remained in the Milton Residence. This Court has instructed that "[h]omestead rights are not abandoned by the conduct of a wife leaving her husband because of his cruelty . . . ." *In re Brent,* 68 B.R. 893, 896 (Bankr.D.Vt.1987) (Conrad, J.). Similar to a debtor thinking he could not return to his homestead because of a court order, *see id.,* here, the Debtor thought the only way she could escape the abuse and potential violence of her ex-spouse was to leave her homestead. Thus, I find the Debtor's departure from the Milton Residence in December 2001 was not a voluntary act and did not constitute an abandonment of her homestead.

Second, I find the fact that the Debtor opened a Florida checking account to be inconclusive on the issue of abandonment of the homestead. Even considering it together with the other facts enumerated above, I find this fact to be insignificant, since a person may maintain multiple bank accounts in different states for various reasons without abandoning her homestead.

Third, while the obtaining of a Florida driver's license can weigh in favor of a finding that the Debtor abandoned her Vermont homestead, I am persuaded by the Debtor's testimony that her sole purpose in doing so was to have in-state identification, thereby making it easier for her to write and cash checks in Florida. Moreover, I find that the Debtor's surrender of her Vermont driver's license while it was still valid adds credence to her explanation for getting the Florida driver's license. Thus, I further find that the Debtor's acquisition of a Florida driver's license does not necessarily lead to the conclusion that the Debtor intended to abandon the Milton Residence homestead.

Fourth, I am likewise convinced by the Debtor's credible testimony, that she had no intention of establishing Florida residency when she registered to vote in Florida. Rather, the Debtor's explanation persuades me that the Debtor's sole purpose in signing the voter registration card was to be eligible to sign the petition presented to her. The Debtor's testimony about why she registered to vote in Florida and her sense of having been "put on the spot," actually persuades me that the Debtor's decision to register to vote in Florida was not well-thought out and that she did not fully comprehend the legal ramifications of her act, especially regarding her Milton Residence homestead. Thus, I find that the Debtor's registering to vote in Florida falls short of evidencing an intent to abandon the homestead.

Fifth, I do not find the Debtor's re-titling and registering her second car in Florida to support a finding of abandonment. Instead, I find that the Debtor's explanation of the situation (*i.e.,* she re-titled and registered the second car for her sister's use) to be entirely plausible. It is

reasonable that the Debtor would want to reciprocate for her sister's extended hospitality. The Debtor's decision to allow her sister to use the Debtor's second car adds no weight to the argument that the Debtor intended to abandon her Vermont homestead. Therefore, I do not find this fact to weigh in favor of abandonment.

Finally, in addition to the factual scenarios identified and explained in this case, I am convinced that the Debtor intended to return to the Milton Residence homestead if that property did not sell. I come to this finding based upon the Debtor's credible representation of this intention in combination with the testimony of both her ex-husband and her father. Each of the latter witnesses testified that it was his understanding the Debtor intended to return to the Milton Residence if she could not sell it. No credible evidence was presented to rebut this collective representation. Thus, I find the Debtor always intended to return to the Milton Residence if she could not sell it. In sum, I reach an overall finding that the Debtor did not abandon her Milton Residence homestead when she left it in December 2001.

### III. CONCLUSIONS OF LAW

#### A. Legal Conclusion as to Burden of Proof

I find that the Bank has not met its burden of proof in this matter. The specific exigencies of the Debtor's situation at the time she left the Milton Residence in December 2001, particularly her precarious domestic situation, the testimony of Mr. Renfrew and Mr. Detko on this point, and the Debtor's absolutely credible testimony explaining her rationale for her various decisions and activities in Florida, convinces me that this case falls closer to the non-abandonment end of the "abandonment spectrum." Given that the homestead exemption should be liberally construed and finding the Debtor did not intend to abandon her Milton Residence homestead when she left it in December 2001, the purpose and spirit of Vermont's homestead exemption compel a determination that the Debtor be allowed to claim the Milton Residence as exempt.

#### B. Legal Conclusion as to Abandonment of Homestead and Right to a Homestead Exemption

■ After considering the entire record and carefully weighing the facts of this case in relation to the Debtor's surrounding exigencies, and analyzing these facts in light of applicable case law, the Court finds the Debtor did not intend to voluntarily abandon the Milton Residence when she left for Florida in December 2001. Her absence from the Milton Residence was both temporary and the result of a situation that was not of her choosing. Hence, finding she did not intend to abandon her homestead, I further find that the Debtor is entitled to claim this property as exempt, as her homestead; and, consequently, to claim as exempt the proceeds from the sale of the Milton Residence. *See, e.g., In re Oliver,* 182 B.R. 699, 700 (Bankr. D.Vt.1995) ("Vermont's legislature intended that its citizens should be able to exempt up to [$75,000] in value of their homesteads, 27 V.S.A. § 101, as well as their right to receive the proceeds from the sale of that homestead. 12 V.S.A. § 3023.").

#### C. Legal Conclusion as to Avoidance of Lien

Since I have found the property to constitute the Debtor's homestead, and both it and its proceeds to be exempt, I consider next to the Debtor's Motion to Avoid Lien, on the ground that the lien impairs this exemption, and the Bank's objection to the motion. This determination is made by applying the formula set forth in 11 U.S.C.

§ 522(f). If the sum of the lien in question plus all other liens on the property, plus the amount of the exemption the debtor could claim if there were no liens on the property, exceeds the value that the Debtor's interest in the property would have in the absence of any liens, the lien shall be considered to impair the exemption, and be subject to avoidance. *See* 11 U.S.C. § 522(f)(2)(A). Applying that formula to the net proceeds of sale which are the subject of the Debtor's motion here yields the following computation: [2]

| | $ 55,000.00 | the subject lien, *see* § 522(f)(2)(A)(i), Bank's *ex parte* pre-judgment trustee process; |
| *plus* | $ 0.00 | all other liens on the property, *see* § 522(f)(2)(A)(ii), here, there are none; |
| *plus* | $ 50,238.79 | the amount of the exemption that the Debtor could claim if there were no liens on the Milton Residence, *see* § 522(f)(2)(A)(iii), here, the net proceeds of sale; |
| *equals* | $105,238.79 | sum of liens and homestead exemption Debtor could claim if there were no liens on the property, *see* § 522(f)(2)(A); |
| *less* | $ 50,238.79 | the value of the Debtor's interest in the property absent any liens; i.e., the net proceeds of sale; |
| *means* | $ 55,000.00 | is the extent to which the Debtor may avoid liens against the proceeds. |

Since the $105,238.79 sum exceeds $50,238.79—the value of Debtor's interest in the proceeds of the sale absent any liens—by $55,000, the Debtor may avoid the Bank's lien by that "excess." *See, e.g., Corson v. Fidelity & Guaranty Ins. Co. (In re Corson)*, 206 B.R. 17, 21–22 (Bankr. D.Conn.1997) (finding that the extent to which the sum of subsections (i)-(iii) exceeds a debtor's unencumbered interest in his or her residence determines the extent to which debtor may avoid lien). Thus, based upon this analysis, I find the Debtor is entitled to avoid the Bank's lien *in toto*. Accordingly, the Debtor's Motion to Avoid Lien is granted and the Bank's Objection to that Motion is overruled.

This Memorandum constitutes the Court's findings of fact and conclusions of law as to the Debtor's claim to exempt the proceeds of the Milton Property per her Schedule C, the Bank's objection to the Debtor's claimed homestead exemption, the Debtor's Motion to Avoid Lien and the

---

**2.** If the analysis were conducted as to the property itself, rather than as to the proceeds of sale, the Bank's lien would still be avoidable *in toto*. The computation would be as follows:

| | $ 55,000.00 | the Bank's *ex parte* pre-judgment trustee process, *see* § 522(f)(2)(A)(i); |
| *plus* | $ 58,134.00 | the Bank's first mortgage, *see* § 522(f)(2)(A)(ii); |
| *plus* | $ 13,495.74 | state tax lien, *see.* § 522(f)(2)(A)(ii); |
| *plus* | $ 50,238.79 | the amount of the exemption that the Debtor could claim if there were no liens on the Milton Residence, *see* § 522(f)(2)(A)(iii), *i.e.,* the net proceeds of sale; |
| *equals* | $201,629.74 | the sum of all liens plus the homestead exemption the Debtor could claim if there were no liens on the property, *see* § 522(f)(2)(A); |
| *less* | *$132,500.00* | the value of the Debtor's interest in the property absent any liens, *i.e.,* the sale price of the property; |
| *means* | $ 69,129.74 | is the extent to which the Debtor may avoid lien, and allows avoidance in full. |

Bank's Objection to the lien avoidance motion.